UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

WORLD OF BOXING LLC, VLADIMIR
HRUNOV, and ANDREY RYABINSKIY,

      **Plaintiffs,**

  - against -

DON KING and DON KING
PRODUCTIONS, Inc.,

      **Defendants.**

------------------------------------------------------- X

**OPINION AND ORDER**

**14-cv-3791 (SAS)**

*USDC SDNY*
*DOCUMENT*
*ELECTRONICALLY FILED*
*DOC #:* _____
*DATE FILED:* 10/1/14

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Plaintiffs Vladimir Hrunov and Andrey Ryabinskiy are Russian boxing promoters who do business as World of Boxing ("WOB"). Defendant Don King ("King") is an American boxing promoter who does business as Don King Productions. On January 28, 2014, King and WOB entered into an Agreement In Principle ("Agreement"), in which King promised to produce Guillermo Jones ("Jones") for a bout against Denis Lebedev ("Lebedev") on April 25, 2014.[1] The

---

[1]    *See* Agreement In Principle ("Agreement"), Exhibit ("Ex.") A to 7/22/14 Declaration of Olga Korobova, Custodian of Records for the World

day the bout was supposed to take place, Jones tested positive for furosemide, an illicit, performance-enhancing diuretic.  The positive drug test precluded Jones from competing, and the bout was called off.

On May 28, 2014, WOB filed this suit.  WOB alleges that King, by failing to produce a clean fighter, breached the Agreement.[2]  King makes two arguments in his defense.  *First*, he argues that the Agreement only required him to "do everything *within his control* . . . to cause Jones's participation"[3] — because Jones's use of furosemide was not within King's control, it cannot be grounds for breach.  *Second*, King argues that even if he *did* breach the Agreement, his failure to perform should be excused because performance was impossible.  King has also filed two counterclaims, alleging that, in fact, WOB was the party responsible for violating the Agreement.[4]

On August 22, 2014, WOB moved for partial summary judgment on the question of contract liability.  WOB seeks (1) a ruling that King is liable for

Boxing Association ("Korobova Decl.").

[2]    *See* Plaintiffs' Complaint and Demand for Jury Trial ("Complaint"), ¶¶ 36-47.

[3]    Defendants' Memorandum in Opposition to Summary Judgment ("Def. Mem."), at 11 (emphasis added).

[4]    *See* Defendants' Answer ("Answer") ¶¶ 28-40.

breaching the Agreement, (2) dismissal of King's counterclaims, and (3) a judgment that WOB is entitled to reimbursement of funds from a disputed escrow account ("escrow funds").[5]  For the reasons set forth below, WOB's motion is GRANTED as to liability, and GRANTED as to the dismissal of King's counterclaims.  However, judgment on the escrow funds is reserved.[6]

## II.    BACKGROUND

The following facts are undisputed.  On May 17, 2013, Jones and Lebedev fought in a Cruiserweight Title Fight in Moscow, sanctioned by the World Boxing Association ("WBA"), which Jones won by knockout in the eleventh round.[7]  After the bout, however, Jones's urine tested positive for furosemide, prompting an investigation by the WBA.  On October 17, 2013, the WBA found Jones guilty of using a banned substance, stripped him of the Cruiserweight title, and suspended him from WBA-sanctioned bouts for six months.[8]

---

[5]      See Plaintiffs' Motion for Partial Summary Judgment, at 1.

[6]      Accordingly, facts having exclusively to do with the creation and disposition of the escrow account are omitted here.  A schedule for briefing on damages is set out at the end of this Opinion.

[7]      See Complaint ¶ 14.

[8]      See WBA Resolution of October 17, 2013 ("2013 WBA Resolution"), Ex. B to 8/22/14 Declaration of Michael A. McAleenan, General Counsel to the

On January 28, 2014, King and WOB finalized terms for a second administration of the Cruiserweight Title match between Lebedev and Jones.  In the Agreement, King represented that he "holds the exclusive promotional rights for Jones,"[9] and he promised to "cause Jones [] to participate" in the rematch.[10] The Agreement also imposed the following restrictions on Jones:

> Jones must arrive in Moscow a minimum of 7 days before the Event and shall remain in Moscow until the Event.  Jones also undertakes to be subjected to drug testing before and after the fight, in compliance with the rules of the WBA and the [2013 WBA Resolution].[11]

The purpose of these provisions, as King has explained by affidavit, was to "preclude another [] positive drug test [from Jones]."[12]

The rematch was finalized for April 25, 2014.  On April 23, 2014, urine samples were collected from both Jones and Lebedev and submitted for testing.  On April 25, 2014 — the day the bout was supposed to take place — a report was issued, finding that Lebedev's sample was clean but that Jones's sample

---

WBA ("McAleenan Decl.") § IV ¶ B.

[9]     Agreement § III ¶ 1.

[10]     *Id.*

[11]     *Id.* § III ¶ 6.  These terms were slightly modified in an addendum on March 17, 2014, but not in any way that impacts this case.  *See* Addendum to Prior Agreement, Ex. B to Korobova Decl.

[12]     9/11/14 Affidavit of Don King ("King Aff."), ¶ 8.

tested positive for furosemide.  When WOB and Lebedev learned of this news,

Lebedev withdrew from the bout.[13]  On April 28, 2014, the WBA issued a letter

deeming Lebedev's withdrawal "justifiabl[e]" on the basis that "[t]he WBA would

not, and could not, sanction a championship bout when it was aware of Jones'

positive test as this would violate WBA rules, may cause unnecessary harm to

[Lebedev], and would otherwise compromise the nature of WBA world title

bouts."[14]  On May 23, 2014, after reviewing the test results more carefully, the

---

[13]     The parties have a dispute about the significance of various events leading up to Lebedev's decision to withdraw.  King submits — and for the purposes of this Opinion, I will accept as true — that immediately after the positive test, Carlos Chavez, the WBA supervisor in Moscow in charge of the bout, "ruled" that the urine test was unofficial and that "the [bout] should take place as scheduled."  Defendants' Counterclaim ("Counterclaim") ¶ 23.  In response, WOB counters — and once again, I will accept this as true — that after Chavez ordered the bout to go forward, Gilbert Mendoza, Jr., the President of the WBA, reversed Chavez's decision and deemed the bout cancelled.  *See* McAleenan Decl. ¶¶ 21-22.

        For the reasons set forth during the August 15, 2014 conference, this dispute is irrelevant.  As I put it then, because "it is not in dispute that [Jones] took a prohibited substance, [there is no reason to] care about Chavez and Mendoza. [Jones] could not have fought [the] bout.  There is no question that [King] could not produce him.  The only [] question is [whether King was obligated to produce him, and if so] whether the breach was excused."  8/15/14 Transcript of Premotion Conference ("Conf. Tr."), at 3.

[14]     4/28/14 Letter from McAleenan, on Behalf of the WBA, Ex. E to Korobova Decl., at 2.  The WBA rule referenced in the letter is C.45, which provides, in relevant part, that "[n]o boxer who has tested positively for prohibited substances can be rated, retain a title, *or be permitted to fight in a sanctioned bout* for a period of no less than six (6) months from the date of the positive test."  Rules of World of Boxing Association ("WBA Rules"), Ex. A to McAleenan Decl. § C ¶ 45 (emphasis added).

WBA issued a resolution (1) affirming the finding that Jones's urine contained furosemide, (2) suspending Jones from WBA-sanctioned bouts for two years, and (3) naming Lebedev Cruiserweight champion.[15]

On May 28, 2014, WOB brought the present suit.  It argues that King, by failing to "cause Jones [] to participate" in the bout, breached the terms of the Agreement.[16]  King has counterclaimed, asserting breach by WOB.[17]  He argues that Lebedev's decision to "unilaterally" withdraw[18] — after learning of Jones's positive drug test — violated the terms of the Agreement.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "where, construing all the evidence in the light most favorable to the [non-moving party] and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact and . . . the [moving party] is entitled to judgment as a matter of law.'"[19]  "A fact is material if it might affect the outcome of the suit under the governing law, and an

---

[15]   *See* WBA Resolution of May 23, 2014, Ex. E to Complaint, at 3.

[16]   *See* Complaint ¶¶ 36-47.

[17]   *See* Counterclaim ¶¶ 28-40.

[18]   *Id.* ¶ 25.

[19]   *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[20]  In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."[21]

## IV.   APPLICABLE LAW

"Because this is a diversity action," the Court applies the law of "the forum in which [it] sits."[22]  Here, the Agreement provides that it "shall be interpreted, construed, and enforced in accordance with the laws of the State of New York."[23]  Therefore, New York law governs.

### A.   Breach of Contract

Under New York law, contracts are given "the meaning intended by the parties, as derived from the language of the contract in question."[24]  Contract

---

[20]     *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[21]     *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks and citations omitted).

[22]     *Ash v. Richards*, No. 13 Civ. 3736, 2014 WL 3397780, at *1 (2d Cir. July 14, 2014).

[23]     Agreement § III ¶ 9.

[24]     *Duane Reade v. Cardtronics*, 54 A.D.3d 137, 140 (1st Dep't 2008).

construction is not simply a matter of examining "literal language."[25]  It requires

courts to consider what can be "reasonably implied" from the contract's language,

in order to determine what "a reasonable person in the position of the promisee

would be justified in understanding [the contract to] include[]."[26]  As a matter of

law, if a contract makes reference to extraneous rules or regulations, the content of

those rules or regulations is incorporated into the contract's terms.[27]

   Breach of contract claims are subject to a four-part test.  To prevail, a

plaintiff must show:  "(1) the existence of a contract between [the plaintiff] and

[the] defendant; (2) performance of the plaintiff's obligations under the contract;

(3) breach of the contract by [the] defendant; and (4) damages to the plaintiff

caused by [the] defendant's breach."[28]  Here, the only element in dispute is the

third prong of the test.

### B.  The Defense of "Impossibility"

---

[25] *Sutton v. East River. Sav. Bank*, 55 N.Y.2d 550, 555 (1982).

[26] *Id.*

[27] *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 144 (2d Cir. 1998)
(applying New York law).

[28] *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52
(2d Cir. 2011) (applying New York law).

Breaches of contract normally carry "strict liability."[29]  However, a breach can be excused — and liability extinguished — if the breaching party can show that performance was impossible on account of a "supervening event" whose "non-occurrence of that event [was] a 'basic assumption' on which both parties made the contract."[30]

To sustain an impossibility defense, the "supervening event" must have been "unanticipated" by the parties.[31]  As the Supreme Court has explained, if an event "was foreseeable," it "should have been [provided] for it in the contract, and the absence of such a provision gives rise to the inference that the risk was assumed" by the party whose performance was frustrated.[32]  In other words, an impossibility defense only excuses non-performance if the "unanticipated event [] could not have been foreseen or guarded against in the contract."[33]

---

[29]     Restatement (Second) of Contracts ("Second Restatement"), Introductory Note to Chapter 11 ("Intro. to Chap. 11") (1981).

[30]     *Id.* § 261(b).

[31]     *Kel Kim, Corp. v. Central Mkts., Inc.*, 70 N.Y.2d 900, 902 (1987). *Accord U.S. v. Winstar Corp.*, 518 U.S. 839, 905 n.53 (1996) (citing *Kel Kim* and compiling other sources).

[32]     *Winstar*, 518 U.S. at 905 (internal citations omitted).

[33]     *Kel Kim*, 70 N.Y.2d at 902.  *Accord East 61st Garage v. Savoy Fifth Ave. Corp.*, 296 N.Y.S.2d 338, 344 (N.Y. 1968); *Ogdensburg Urban Renewal Agency v. Moroney*, 345 N.Y.S.2d 169, 171 (N.Y. 1973).  This is not necessarily true in every jurisdiction — the Second Restatement suggests that "[t]he fact that

## V.    DISCUSSION

### A.    King Breached the Contract

The Agreement required King to "cause [Jones] to participate in a 12 Round WBA Cruiserweight World Title match [against Lebedev]."[34]  King argues that this clause is ambiguous, and that its meaning depends on unresolved factual questions, making summary judgment inappropriate.

But the relevant facts are not in dispute.  Under WBA rules — which the Agreement incorporates by reference — any boxer who tests positive for a banned, performance-enhancing substance is disqualified from WBA-sponsored bouts for no less than six months.[35]  Both parties agree that Jones ingested furosemide,[36] and there is no question that having tested positive for furosemide, Jones could not participate in the bout.[37]  This ends the inquiry.  If Jones could not participate in the bout, it follows *a fortiori* that King could not have *caused* Jones

---

the event was foreseeable, or even foreseen, does not *necessarily* compel a conclusion that its non-occurrence was not a basic assumption."  Second Restatement § 261(b) (emphasis added).  But New York law is crystal clear:  the supervening event must have been "unanticipated" for an impossibility defense to prevail.

[34]    Agreement § III ¶ 1.

[35]    *See* WBA Rules § C ¶ 45.

[36]    Conf. Tr. at 2.

[37]    *See* WBA Rules § C ¶ 45.

to participate in the bout.  Therefore, King breached the Agreement.[38]

King protests that this interpretation of the Agreement yields "unreasonable and illogical" results.[39]  It would require of King "nothing less than . . . personal supervision of Jones's every action between the execution of [the Agreement] and the scheduled date of the [bout against Lebedev]."[40]  Indeed, in order to avoid liability, King avers that he would have had "to *imprison* Jones to prevent him from having any access to a banned substance"[41] — clearly an

---

[38]     King's efforts to paint his obligations as "ambiguous" fail.  According to King, in addition to the interpretation adopted here, it is also possible to read the Agreement as requiring King to "do everything within his control and ability to cause Jones's participation."  Def. Mem. at 11.  But a promise to do something, and a promise to *try* to do something, are fundamentally different.  The parties were free, of course, to negotiate contract terms that would only have required King to "do everything within his control and ability to cause Jones's participation."  Such terms are common.  *See* Restatement, Intro. to Chap. 11 ("The obligor who does not wish to undertake [a strict liability] obligation may contract for a lesser one by using one of a variety of common clauses: he may agree only to use his 'best efforts'; he may restrict his obligation to his output or requirements; he may reserve a right to cancel the contract; [and so on].").  But the terms the parties *actually* negotiated were more stringent.  Under the Agreement as written, King is required to cause Jones to participate — not merely to make his best effort to cause Jones to participate.  Because the "cause to participate" clause "convey[s] a definite meaning," no further fact-finding is required.  *Topps Co. v. Cadbury*, 526 F.3d 63, 68 (2d Cir. 2008) (applying New York law).

[39]     Def. Mem. at 9 n.9.

[40]     *Id.* at 8.

[41]     *Id.* (emphasis added).

-11-

untenable outcome.

While these arguments might have force, they are addressed to the wrong issue. King could be right: under the circumstances, it is possible that his contractual obligations *were* too onerous to be enforceable. But that question goes to whether King's failure to perform may be excused, not to whether King in fact failed to perform.[42] As to the latter, Jones's disqualification plainly put King in breach.

## B. Impossibility Does Not Excuse King's Breach

In general, "contract liability is strict liability."[43] Nevertheless, failure to perform can be excused if "destruction of . . . the means of performance makes performance objectively impossible."[44] In this vein, King likens his plight to that of a singing troupe manager who signed a contract with a theater owner, promising that the troupe would play for two weeks, only to have the lead singer fall ill on the

---

[42] The error in King's reasoning is particularly apparent when he argues that interpreting the contract to "unconditionally require[] [him] to [] cause Jones to engage in the bout . . . would leave [him] no recourse if Jones were to die, become injured, refuse to fight, or otherwise become incapable of participating in a WBA-sanctioned championship bout." Def. Mem. at 11. That is simply not true. Under those circumstances, King's "recourse" would be to raise an impossibility defense — just as he has.

[43] Second Restatement, Intro. to Chap. 11.

[44] *Kel Kim*, 70 N.Y.2d at 902.

eve of the first show.  When the theater owner sued for breach, the New York

Court of Appeals excused the manager's non-performance on the grounds that

"[c]ontracts for personal services" — contracts that require action by a specific

person — "are subject to [the] implied condition[] that . . . if [the person] dies, or

without fault on the part of the covenantor becomes disabled, the obligation to

perform is extinguished."[45]  Likewise here, argues King:  by ingesting furosemide,

Jones "disabled" himself from participating in a WBA-sponsored bout, thereby

"extinguishing" King's obligation to perform.

New York law is very clear, however, that an impossibility defense is

only available if the frustration of performance was "produced by an unanticipated

event that could not have been foreseen or guarded against in the contract."[46]  In

this case, two key facts compel the conclusion that Jones's ingestion of furosemide

was not "unanticipated" — i.e., that King should have foreseen the possibility of

Jones testing positive and guarded against it in the contract.  *First*, Jones had a

history of doping.  The result of the first Cruiserweight Title match between Jones

and Lebedev — in May 2013 — had to be vacated because Jones tested positive

---

[45]     *Spalding v. Rosa*, 71 N.Y. 40, 44 (1877).

[46]     *Kel Kim*, 70 N.Y.2d at 902.  *Accord East 61st Garage*, 296 N.Y.S.2d
at 344; *Ogdensburg*, 345 N.Y.S.2d at 171.

for furosemide after the fact.[47]  *Second*, the Agreement provided for mandatory

pre-bout drug testing,[48] as required by the 2013 WBA Resolution.[49]

       King tries to turn these facts around.  Noting how "stunned" and

"shocked" he was to learn of the positive drug test on April 25, 2014,[50] King

reports that "it defie[d] belief, that Jones, aware that he would be subjected to pre-

bout drug testing due to his previous positive result, *would again test positive* for

the same banned substance."[51]  Put otherwise, King "believed that the mandatory

drug testing provision . . . would preclude another potential positive drug test,

because [Jones] knew that [he] would be subject to random [] testing."[52]

Therefore, in King's view, he should not be punished for failing to foresee such a

"plainly remote and unlikely event."[53]

       While King's dismay is understandable — it *is* stunning that Jones

was foolish enough to test positive for the same drug twice — his argument

---

[47]     *See* Complaint ¶¶ 16-18.

[48]     *See* Agreement § C ¶ 6.

[49]     *See* 2013 WBA Resolution § IV ¶ E.

[50]     King Aff. ¶ 22.

[51]     Def. Mem. at 13 (emphasis added).

[52]     King Aff. ¶ 8.

[53]     Def. Mem. at 13.

misconstrues the term "unanticipated event."  King casts the question in terms of probability:  an event is "unanticipated," in his view, if it is unlikely to occur. What the case law has in mind, however, are not improbable events, but events that fall outside the sphere of what a reasonable person would plan for.[54]  Even assuming that King is right about the likelihood of a second positive test, it strains credibility to call the event "unanticipated."

King's own testimony proves the point.  By way of explaining why the Agreement was silent about what to do in the event of a second positive test, King admits that he thought the "mandatory drug testing provision" would "preclude" Jones from ingesting furosemide.[55]  No doubt he did.  From this testimony, however, no one could reasonably conclude that King had not anticipated the possibility of a second positive test.  Rather, the inescapable conclusion is that King *had* anticipated such a possibility — and having anticipated it, he believed the threat of a mandatory drug test would ward it off.  That King's belief turned out to be mistaken is no basis for relieving him of his contract obligations.

---

[54]    *See, e.g.*, *Kel Kim*, 70 N.Y.2d at 902 (emphasizing that the proper question is whether the performance-frustrating event should have been "foreseen and guarded against in the contract").

[55]    King Aff. ¶ 8.

In essence, King argues that he should not be held liable because Jones's decision to take furosemide was outside of King's control:  short of "imprison[ing] Jones,"[56] there was no way for him to perform.  But this argument ignores what *was* in King's control:  the decision not to bargain for more protective contract terms.

After all, WOB could *also* invoke the "imprisonment" logic — in support of the opposite view.  If I were to rule that Jones's ingestion of furosemide effectively dissolved the Agreement, and that King's failure to perform was therefore excused, WOB might reasonably object that *it* had no way — short of imprisoning Jones — to avoid the economic loss of that outcome.  Ultimately, the reality is that Jones's poor decision-making was costly to both parties.  The question is which party — King or WOB — should have to shoulder those costs.  The law makes it clear that the answer is King.  As the party who promised to secure Jones's participation, King "assumed the risk" of foreseeable events that might frustrate his ability to make good on that promise.[57]  Because the risk of a second positive test was foreseeable — so foreseeable, in fact, that the Agreement set out a mandatory testing provision to lessen its likelihood — King's breach

---

[56]      Def. Mem. at 8.

[57]      *See Winstar*, 518 U.S. at 905.

cannot be excused.

### C.      King's Counterclaims Fail

Both of King's counterclaims rest on the proposition that Lebedev's decision to withdraw from the bout constituted either a breach or a dissolution of the Agreement, releasing King from his obligations.  This proposition is wrong.  Once Jones tested positive, WOB and Lebedev were entitled to "treat the entire contract as broken," because Jones's participation (which the positive test rendered impossible) was the centerpiece of the agreement.[58]  In other words, King's argument that Lebedev breached the Agreement necessarily fails, because the Agreement had *already* been breached — by King — when Lebedev withdrew.  King's counterclaims are therefore dismissed.

### VI.   CONCLUSION

For the foregoing reasons, WOB's partial motion for summary judgment as to liability is GRANTED.  The Clerk of the Court is directed to close this motion (Dkt. No. 26), and the parties are directed to submit briefings as to damages in accordance with the following schedule:  WOB's moving papers (15 pages) should be filed by October 10; King's opposition (15 pages) should be filed

---

[58]      *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 388 (S.D.N.Y. 1999) (quoting *Inter-Power of New York, Inc. v. Niagara Mohawk Power Corp.*, 686 N.Y.S.2d 911, 913 (3d Dep't 1999)).

by October 17; and WOB's reply (5 pages) should be filed by October 24.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:        New York, New York
              October 1, 2014

**- Appearances -**

**For Plaintiffs:**

Kent A. Yalowitz, Esq.
Matthew D. Grant, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022
(212) 715-1113

**For Defendants:**

T. Barry Kingham, Esq.
Andrew B. Zinham, Esq.
Curtis, Mallet-Prevost, Colt and Mosle LLP
101 Park Avenue South 35th Floor
New York, NY 10178
(212) 696-6000