UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

WORLD OF BOXING LLC, VLADIMIR
HRUNOV, and ANDREY RYABINSKIY,

**Plaintiffs,**

- against -

DON KING and DON KING
PRODUCTIONS, Inc.,

**Defendants.**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/2/15

**OPINION AND ORDER**

**14-cv-3791 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

On October 1, 2014, I ruled that Don King, doing business as Don

King Productions, breached his agreement with Vladimir Hrunov and Andrey

Ryabinskiy, who do business as World of Boxing (collectively "WOB"), when he

failed to "cause Guillermo Jones to participate in [a] bout" against Denis Lebedev

("the bout").[1]  The remaining question — addressed in this Opinion — is the

---

[1]    *See World of Boxing LLC v. King*, No. 14 Civ. 3791, 2014 WL
4953605 (S.D.N.Y. Oct. 1, 2014).  For the purposes of this Opinion, familiarity
with the underlying facts is presumed.

amount that King owes to WOB.  After my merits ruling, WOB moved for

summary judgment on a reliance theory of contract damages.  For the reasons set

forth below, the motion is GRANTED in part and DENIED in part.

## II.   BACKGROUND

Because WOB's "lost profits" — *i.e.*, its expectation damages —

"cannot be reasonably quantified," it seeks instead to recover the costs it incurred

in anticipation of the bout.[2]  These costs are divided into two categories.  *First*, per

the terms of the parties' agreement, WOB paid $800,000 into an escrow account,

of which "$250,000 [was] immediately payable to King."[3]  *Second*, WOB

expended approximately one million dollars in preparation for the bout.  These

expenses include, *inter alia*, transportation, lodging, facilities, and promotion.[4]

WOB has moved to recover both categories of costs, for a total of approximately

$1.8 million.[5]  Of this, King concedes that $536,000 — which represents the

---

[2]      Plaintiffs' Memorandum of Law in Support of Summary Judgment ("Pl. Mem."), at 1.

[3]      Plaintiffs' 56.1 Statement of Undisputed Facts ("Pl. 56.1"), ¶ 9. Accord Defendants' Response to Plaintiffs' 56.1 Statement of Undisputed Facts ("Def. 56.1"), ¶ 9.

[4]      *See* List of Payments, Exhibit ("Ex.") A to 12/09/14 Declaration of Maxim Kopylkov, Custodian of Financial Records for the World Boxing Association ("Kopylkov Decl.").

[5]      *See* Pl. 56.1 ¶ 12; Def. 56.1 ¶ 12.

portion of the escrow account not immediately payable to King ($550,000), minus legal fees, plus interest — is due to WOB per the terms of the parties' escrow agreement ("Agreement").[6]  The parties' dispute therefore concerns (1) the remaining $250,000 from the escrow account, and (2) the one million dollars of preparatory costs.

King has raised two arguments.  *First*, he maintains that WOB should not be able to recover the $250,000 that was immediately payable to him upon execution of the Agreement.  According to King, the disposition of that sum is governed by the terms of the Agreement, which earmarks the $250,000 as a "non-refundable" payment to King, to be retained "whether or not the bout occur[s]."[7]  *Second*, King argues that although WOB is correct that "New York law provides for recovery of reasonable, foreseeable, reliance damages," those damages must be offset by "any loss that . . . the injured party would have suffered had the contract been performed."[8]  And in this case — according to King — WOB would have incurred significant losses even if the bout had gone forward. Therefore, its reliance damages should be capped at the amount of revenue that

---

[6]    *See* Defendants' Memorandum in Opposition to Summary Judgment ("Opp. Mem."), at 13.

[7]    *Id.*

[8]    *Id.* at 5-6.

WOB could reasonably have expected from the bout, which, if measured in terms of the ticket sales that WOB was forced to refund, is just shy of $100,000.[9]  In light of this, King asks this Court either (1) to enter judgment for WOB in that amount, plus return of the $536,000 currently being held in escrow, or (2) to deny WOB's motion on the grounds that parties have a material dispute of fact regarding whether, and to what extent, WOB would have suffered losses if the bout had occurred.[10]

## III.   STANDARD OF REVIEW

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the [non-moving party] and drawing all reasonable inferences in that party's favor, there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."[11]

---

[9]      *See id.* at 10-11.

[10]     To be clear, King is *not* disputing that WOB did, in fact, incur the preparatory costs it claims to have incurred.  The only material dispute of fact concerns the extent of WOB's projected losses (or gains), as they affect WOB's ability to recover reliance damages.

[11]     *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (internal citations omitted).  *Accord Whethers v. Nassau Healthcare Corp.*, No. 13 Civ. 2991, 2014 WL 4637215, at *1 (2d Cir. Sept. 18, 2014) (quoting *Matsushita v. Zenith Radio*, 475 U.S. 574, 587 (1986)) ("Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.").

## IV.   APPLICABLE LAW

New York courts have long distinguished between two different forms of redress in breach of contract suits:  "expectation damages" and "reliance damages."[12]  Expectation damages provide the injured party with the benefit she would have enjoyed had no breach occurred — *i.e.*, they aim to fulfill the injured party's *expectations* from the contract.[13]   Reliance damages, by contrast, seek to restore the injured party to the position she was in before the contract was formed.[14]  They allow for recovery of "expenditures [the injured party] made in reliance on defendant's representations and that he otherwise would not have

---

[12]      The agreement between the parties was governed by New York law. *See* Agreement In Principle, Ex. A to 7/22/14 Declaration of Olga Korobova, Custodian of Records for the World Boxing Association ("Korobova Decl."), § III ¶ 9.

[13]      *See* Restatement (Second) of Contracts ("Second Restatement"), § 347 (1981) ("[T]he injured party has a right to damages based on his expectation interest as measured by the loss in the value to him of the other party's performance caused by its failure or deficiency, plus any other loss, including incidental or consequential loss, caused by the breach, less any cost or other loss that he has avoided by not having to perform.").

[14]      *Clifford R. Gray, Inc. v. LeChase Const. Services*, 857 N.Y.S.2d 347, 349 (3d Dep't 2008) (explaining that the purpose of reliance damages is to return "the non-breaching party to the position it would have been in had it not relied on defendant's alleged promise").

made."[15]   Under New York law,[16] when expectation damages defy precise

calculation, reliance damages are the appropriate remedy.[17]   That is what WOB

seeks.

       To calculate reliance damages, courts must assess the costs that "a

plaintiff [incurred from] . . . 'expenditures made in preparation for performance or

in performance, less any loss that . . . the injured party would have suffered had the

contract been performed.'"[18]   The purpose of offsetting reliance damages against

anticipated losses is to ensure that contract damages do no more than make an

injured party whole — *i.e.*, to ensure that damages do not "put the plaintiff [] in a

better position than he would have occupied had the contract been fully

performed."[19]   Thus, "[i]f the breaching party establishes that the plaintiff's losses

---

[15]    *Farash v. Sykes Datatronics*, 465 N.Y.S.2d 917, 919 (1983)

[16]    The agreement between the parties was governed by New York law. *See* Agreement In Principle, Ex. A to 7/22/14 Declaration of Olga Korobova, Custodian of Records for the World Boxing Association ("Korobova Decl."), § III ¶ 9.

[17]    *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 13 N.Y.3d 204, 208 (2009).

[18]    *Id.* (quoting Second Restatement § 349).

[19]    *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992) (applying New York law). *Accord V.S. Int'l v. Boyden World Corp.*, 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994) (describing the offset principle as an anti-windfall mechanism).

-6-

upon full performance would have equaled or exceeded its reliance expenditures, the plaintiff will recover nothing under a reliance theory."[20]

Typically, the party who moves for summary judgment bears the burden of demonstrating that no material dispute of fact exists. In this context, however, it is the party *in breach* — in this case, King — that bears the burden of "prov[ing] with reasonable certainty" what losses the "injured party would have suffered" in the event that all contractual obligations had been properly discharged.[21]

## V.    DISCUSSION

### A.    The Escrow Account

King's position — which WOB makes no effort to contest — is that under the terms of the Agreement, $250,000 of the $800,000 deposit was intended as an "immediately payable," non-refundable signing bonus.[22] I agree. The Agreement explicitly contemplates the possibility of the bout "fail[ing] to take place."[23] And in that case, King has the right — under the Agreement — to retain

---

[20]    *Bausch & Lomb*, 977 F.2d at 729.

[21]    *St. Lawrence Factory Stores*, 13 N.Y.3d at 208.

[22]    Escrow Agreement, Ex. C to Korobova Decl. § 4(i).

[23]    *Id.* § 4(iii).

the $250,000.[24]  If WOB sought a refund of King's signing bonus in the event of a breach, it could have bargained for a provision to that effect.  It did not.  The money belongs to King.

### B.    The Preparatory Expenditures

King does not argue that WOB's preparatory expenditures are improperly calculated.[25]  Nor does he claim that any of WOB's preparatory expenditures were not reasonable or foreseeable.  Instead, King invokes the principle that reliance damages should be offset against losses that WOB "reasonabl[y] certain[ly]" would have incurred, and he argues that WOB's damages should therefore be capped at $98,607 — the value of the tickets that WOB had to refund as a consequence of the bout's cancellation.

King's argument rests on the premise that WOB stood to derive only one type of benefit from the bout, had the bout gone forward — revenue already realized from ticket sales prior to the breach.  This premise is erroneous.  In fact, there are (at least) two other types of benefits that WOB might have enjoyed in

---

[24]      *See id.* (providing, in case the bout does not take place, that the "*remaining amount* of the deposit" — *i.e.*, the original deposit minus the $250,000, adjusted for fees and interest — should be returned to WOB) (emphasis added).

[25]      Or — to the extent that King does dispute WOB's claimed preparatory expenses — it is only insofar as WOB categorized the $250,000 *as* a preparatory expenditure.  This is an issue of labels, not substance.

connection with the bout.

   *First*, WOB might well have realized revenue during and after the bout. Maxim Kopylkov, custodian of financial records for the WOB, testified that WOB "expected to receive an undetermined amount of revenue from the television broadcast of [the bout] and from business generated by promotional and advertising activity during [the bout]."[26] King complains — correctly — that WOB has not provided a rigorous accounting of the post-bout revenue it expected to receive.[27] But that is not surprising. The whole reason that WOB is seeking reliance damages rather than expectation damages is that its projected profits (and losses) from the bout are a matter of speculation. To fault WOB for failing to offer concrete projections of post-bout profit would reverse the burden of proof. It is not WOB's burden to prove how much profit it stood to gain. Rather, because King seeks to reduce the amount of preparatory costs that WOB can recover — costs that King admits WOB would not have incurred had no agreement existed — King has the burden to prove with certainty that WOB would *not* have made further revenue.

   King has not sustained his burden. He has offered no theory — much

---

[26]  Kopylkov Decl. ¶ 6.

[27]  *See* Opp. Mem. at 8 (noting that WOB "[has] not produce[d] any documents in support of these phantom and 'undetermined' amounts of revenue").

less any factual material — to suggest that WOB would have seen no financial upside from the television broadcasting of such a hotly anticipated match.[28]  The lack of supporting evidence is not surprising, because King's economic analysis makes little sense.  If King is right, WOB's revenue from the bout would have been less than the amount it pledged to King as a signing bonus, even putting *every other preparatory cost* to one side.  That hypothesis is implausible.  This was no small-time bout; it was the Cruiserweight World Title match.  Furthermore, WOB and King are both sophisticated parties, with proven track records in the boxing world.  Although it is certainly *possible* that WOB agreed to underwrite a bout of this import without realizing how drastically its costs would outstrip its gains,[29]

---

[28]      In this regard, King's main argument is that WOB "[has] not produced a contract, or any other document, regarding the broadcast of [the bout] and any potential related revenue."  Opp. Mem. at 9.  Apart from failing as an evidentiary matter — *i.e.*, WOB's failure to identify a document codifying broadcasting rights does not prove that it would receive no broadcasting revenue — this argument also distorts the record.  Kopylkov testifed in his deposition that in fact there *was* a framework in place for calculating WOB's broadcasting revenue, and that it would be based on the ratings of the broadcast.  *See* 12/19/14 Deposition Transcript of Maxim Kopylkov, Ex. B to Declaration of Matthew Grant, Counsel for WOB, at 208-210.

[29]      If King is correct — that pre-bout ticket sales were going to be WOB's sole source of revenue from the bout — WOB was not just running a marginal loss; it was running a loss of more than *ten times* its total revenue.  WOB sold approximately $175,000 in tickets, but it laid out slightly more than $1.8 million, when the full value of the escrow account (which would have been liquidated to King if the bout had occurred) is included.  *See* Escrow Agreement § 4(ii).  That is a staggering loss-to-gain ratio.

that explanation seems very unlikely.  And King has given the Court no reason to think it more likely on the specific facts of this case.

> *Second*, WOB might have expected to derive future benefits from the bout — benefits that would not be manifest in immediate revenue, but that would nevertheless make the bout a worthwhile investment for WOB.  Indeed, this possibility underscores the conceptual error at the heart of King's position.  It disregards the fact that businesses can — and often do — engage in rational loss-leading.  There are numerous ways that WOB might have derived value from the bout after the fact.  Post-event gains might have included, for example, profit from future re-broadcasting; the benefit of a continued business relationship with Lebedev (the boxer whom WOB was promoting); or simply the creation of a positive track-record within the boxing world.

> By way of analogy, imagine if a young art dealer, eager to promote her first gallery, entered into the following arrangement with a famous artist — she will pay him $5,000, and he will visit the gallery to give a lecture about this work.  Having scheduled the event, the gallery owner sends out invitations, and she hires caterers, a live band, and security personnel — all of which costs her (a non-refundable) $10,000.  The night before he is supposed to speak, the artist backs out, forcing the gallery owner to cancel the event.  She sues him for breach

of contract, seeking $10,000 in reliance damages.  In response, the artist argues

that the gallery owner stood to derive no profit from the event — indeed, she stood

to lose $15,000 — so any reliance damages should be offset to zero.

The artist's logic, which is also King's logic, is flawed.  It misses the

point — even if it is accurate — to say that the gallery owner was not going to

derive an immediate financial benefit from the event.  That was not the event's

purpose.  Rather, the event was a capital investment, which the gallery owner

thought would pay off in the future.  In the real world, many investments are made

without a guarantee of return, and some are even made with the explicit *intention*

of losing money — at least in the short-term.  A theory of contract damages that

fails to account for this reality cannot be right.

Indeed, this is exactly why a breaching party bears the burden of

"prov[ing] with reasonable certainty" that losses would have occurred absent a

breach.[30]  To cap reliance damages, a breaching party must show, in effect, that

losses were inevitable.  In *St. Lawrence Factory Stores v. Ogdensburg Bridge &*

*Port Authority*, for example, the Third Department held that an offset was

appropriate when a construction project was simply "not feasible," because

plaintiff was bound by covenant to build a retail factory outlet but was not able to

---

[30]     *St. Lawrence Factory Stores*, 13 N.Y.3d at 208.

secure adequate financing for the project.[31]  In light of this, the court reasoned that plaintiff should not be able to recover preparatory expenditures — because the project was doomed.  Here, it is far from clear that WOB's investment in the bout was fated to be a losing proposition.  Kopylkov's testimony suggests otherwise.  As does common sense.

Ultimately, King has extrapolated the wrong principle from the case law.  In his view, if a breached contract was not going to yield an immediate and direct financial benefit, no reliance damages should be awarded.  But the correct principle is narrower, and — as one might expect — more favorable to injured parties.  Plaintiffs who prevail on breach of contract claims may recover full reliance damages *unless* there is evidence that completion of the contract could not possibly have resulted in gain.  Here, that is plainly not the case.  WOB is entitled to recover its preparatory costs.

### C.    Offsetting Reliance Damages Against Retained Revenue

Putting the foregoing analysis to one side, King is certainly right about one thing.  Reliance damages are about restoration.  They strive to "place [injured parties] in the same position as they were prior to the execution of the

---

[31]     *St. Lawrence Factory Stores v. Ogdensburg Bridge & Port Auth.*, 994 N.Y.S.2d 704, 707 (3d Dep't 2014).

contract," not to work a "windfall" for injured parties.[32]  In this case, WOB retained approximately $75,000 in revenue from ticket sales, notwithstanding the breach.  This amount should be deducted from the final judgment.  Otherwise, WOB would recover its preparatory costs *and* see the upside of ticket sales that never would have been earned absent the contract.

## V.    CONCLUSION

For the reasons set forth above, WOB is entitled to two remedies. *First*, the money currently in the escrow account must be returned to WOB. *Second*, King must pay WOB an amount equal to the costs enumerated in WOB's moving papers,[33] minus:

> (1) The $800,000 initially paid to King (which accounts for the money currently in escrow, plus the $250,000 non-refundable portion distributed to King);

> (2) The revenue that WOB has retained from non-refunded ticket sales.

WOB is also entitled to prejudgment interest on the resulting sum,[34] to be calculated

---

[32]    *Boyden World Corp.*, 862 F. Supp. at 1198.

[33]    *See* Pl. Mem. 6-7.

[34]    King has offered no argument against assessing prejudgment interest. Nor could he.  It is black letter New York law that parties that prevail on breach of contract claims are presumptively entitled to collect prejudgment interest in addition to contract damages.  *See* N.Y. C.P.L.R. § 5001(a) ("Interest *shall be* recovered upon a sum awarded because of a breach of performance of a contract.")

-14-

from the date of the breach — April 25, 2014.[35]

WOB is ordered to submit a proposed final judgment, calculating the exact damages award in accordance with this Opinion, no later than close of business on February 9, 2015.  The Clerk of the Court is directed to close this motion (Dkt. No. 43).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 2, 2015

---

(emphasis added).  *See also J. D'Addario & Co. v. Embassy Indus.*, 20 N.Y.3d 113, 117 (2012) (explaining that assessing prejudgment interest is mandatory unless the parties have explicitly "specif[ied] [an] exclusive remedy" in lieu of such interest).

[35]     N.Y. C.P.L.R. § 5001(b) ("[Prejudgment] [i]nterest shall be computed from the earliest ascertainable date the cause of action existed.").

**- Appearances -**

**For Plaintiffs:**

Kent A. Yalowitz, Esq.
Matthew D. Grant, Esq.
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022
(212) 715-1113

**For Defendants:**

T. Barry Kingham, Esq.
Andrew B. Zinham, Esq.
Curtis, Mallet-Prevost, Colt and Mosle LLP
101 Park Avenue South 35th Floor
New York, NY 10178
(212) 696-6000